Opinion
KENNARD, J.
Defendant used re-encoded payment cards to buy gift cards at a department store. After the store’s security guards were alerted to the scam, they asked defendant to show them the gift card receipts and the payment cards used. Defendant did so. When he was told that the numbers on the cards did not match those on the receipts, he began walking away, ignored the security guards’ requests to stop, and then shoved one of the guards. After a brief struggle, defendant was handcuffed. Defendant was later charged with and convicted of several offenses, including, as relevant here, robbery and theft. He here challenges his robbery convictions.
An element of robbery is the “felonious taking of personal property in the possession of another . . . .” (Pen. Code, § 211, italics added; all further statutory references are to the Penal Code.) At issue is the type of theft that constitutes a “felonious taking.” Is it only theft by larceny, as defendant argues? Or can it also be theft by false pretenses (the type of theft defendant committed), as the Attorney General contends? According to the Court of Appeal, which upheld defendant’s robbery convictions, theft by false pretenses can satisfy the “felonious taking” requirement of robbery. We granted defendant’s petition for review, and we now reverse the Court of Appeal’s judgment.
*780 I
On July 4, 2009, defendant Demetrius Lamont Williams entered a Walmart department store in Palmdale. Using either a MasterCard or a Visa payment card, which was re-encoded with a third party’s credit card information, defendant bought a $200 Walmart gift card from a recently hired cashier, who was filling in for a cashier on a break.[1] Defendant then tried to buy three more gift cards from the same cashier. At that point, the regular cashier came back and, after learning of the previous transaction, told defendant of Walmart’s policy prohibiting the use of credit cards for purchases of gift cards. Defendant was permitted to keep the $200 gift card he had initially bought.
Defendant then went to a different cash register and again presented a re-encoded payment card to buy another $200 gift card. The transaction was observed by a Walmart security guard who, accompanied by another guard, asked defendant for the receipt and payment card used. Defendant complied. When told that the payment card’s last four digits did not match those on the receipt, defendant produced two other re-encoded payment cards, but their numbers did not match those on the receipt either.
Defendant began walking toward the exit, followed by the two security guards. When defendant was told to stop, he produced yet another re-encoded payment card, but this card’s last four digits also did not match those on the receipt. As defendant continued walking toward the exit, he pushed one of the guards, dropped some receipts, and started running away. After a brief struggle inside the store, the guards wrestled defendant to the ground and handcuffed him. Recovered from defendant’s possession were four payment cards issued by MasterCard and Visa. Also retrieved from defendant were several gift cards from Walmart and elsewhere.
Defendant was charged with four counts of second degree robbery (§ 211), one count of second degree burglary (§ 459), one count of fraudulent use of an access card (§ 484g), one count of grand theft (§ 487, subd. (a)), and three counts of forgery (§ 484i, subd. (b)), a total of 10 counts. The information also alleged defendant had one prior serious or violent felony conviction (robbery) within the meaning of the “Three Strikes” law (§ 667). Regarding the grand theft count, the court instructed the jury on grand theft by false pretenses. The jury found defendant guilty as charged, and the trial court sentenced him to a total prison term of 23 years eight months. The Court of Appeal reversed defendant’s forgery convictions for insufficient evidence and *781 modified the judgment to stay imposition of the burglary sentence under section 654, which prohibits punishment for more than one crime arising from a single indivisible course of conduct (see People v. Latimer (1993) 5 Cal.4th 1203, 1207-1208 [23 Cal.Rptr.2d 144, 858 P.2d 611]). In all other respects, the Court of Appeal affirmed the trial court’s judgment, including defendant’s robbery convictions.
As he did in the Court of Appeal, defendant here argues his robbery convictions should be reversed because robbery requires theft by larceny, whereas the theft he committed was by false pretenses. We agree.
II
Robbery is “the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.” (§211, italics added.) The term “felonious taking” originated in the common law and was later adopted in California’s robbery statute. (People v. Tufunga (1999) 21 Cal.4th 935, 947 [90 Cal.Rptr.2d 143, 987 P.2d 168] (Tufunga).) At issue here is the meaning of “felonious taking.” Can that element of robbery be satisfied only by the crime of theft by larceny, as defendant argues? Or can it also be committed through theft by false pretenses, as the Attorney General contends?
To help us ascertain the meaning that the Legislature intended when it used the words “felonious taking” in California’s robbery statute (§ 211), we need to examine that statute’s common law roots. We do so below. Part A. discusses the common law origins and development of the related crime of larceny. Part B. discusses the British Parliament’s enactment in the 18th century of the two statutory offenses of theft by false pretenses and embezzlement,[2] both of which were later adopted in the early criminal laws of the American .states. Part C. discusses the elements of robbery, larceny, and theft by false pretenses, and their application to this case.
A. Crime of Larceny
California statutorily defines the crime of theft by larceny as the felonious stealing, taking, carrying, leading, or driving away of the personal *782 property of another. (§ 484, subd. (a).) That statutory definition reflects its English common law roots. (People v. Davis (1998) 19 Cal.4th 301, 304, fn. 1 [79 Cal.Rptr.2d 295, 965 P.2d 1165] (Davis).)
Unlike statutory law, whose authority rests upon an express declaration by a legislative body, the common law “consists of those principles and forms which grow out of the customs and habits of a people,” enshrined in law by virtue of judicial decisions. (1 Burdick, Law of Crime (1946) § 5, pp. 16-17 (Burdick).) Much of the law developed in English courts was later applied in England’s American colonies and then, after independence, in this nation’s states. (See id. at pp. 18, 33-47.) As used in this opinion, the term “common law” denotes a “body of judge-made law . . . developed originally in England.” (Garner, Dict. of Modem Legal Usage (2d ed. 1995) p. 177.) And, as used here, the term “common law crime” means a “crime that [was] punishable under the common law, rather than by force of statute.” (Garner, Black’s Law Dictionary (9th ed. 2009) p. 427.)
The common law defined larceny as the taking and carrying away of someone else’s personal property, by trespass, with the intent to permanently deprive the owner of possession. (See 2 Burdick, supra, § 496i, p. 261, citing 4 Blackstone, Commentaries 229.) Larceny was considered to be an offense less serious than robbery because of robbery’s additional requirement of personal violence against, or intimidation of, the victim. (Perkins & Boyce, Criminal Law (3d ed. 1982) Offenses Against Property, p. 344 (Perkins).) Not that the distinction made any difference to the accused: Under the common law, robbery and larceny were felonies, and all felonies were punishable by death. (Id. at p. 290.)
In 1275, the English Parliament enacted a statutory exception to punishment of death for all felonies. (2 Burdick, supra, § 554, pp. 328-329, citing Statute of Westminster, The First (1275) ch. 15.) The statute. created a sentencing distinction between “grand” and “petit” larceny, making grand .larceny a more serious offense than petit larceny, involving property valued at greater than 12 pence (the approximate price of a sheep). (People v. Ortega (1998) 19 Cal.4th 686, 694 [80 Cal.Rptr.2d 489, 968 P.2d 48] (Ortega); see 2 Burdick, supra, § 554, pp. 328-329; Perkins, supra, at p. 290.) Under the 1275 statute, grand larceny remained punishable by death, but petit larceny became punishable only by imprisonment, whipping, or forfeiture of goods. (See Ortega, supra, at p. 694, citing 3 Wharton, Criminal Law (15th ed. 1995) § 344, p. 361; Perkins, supra, at p. 290.) Larceny remained a felony, however, irrespective of whether it was grand or petit. (Ortega, supra, at p. 694.) Therefore, larceny was, in essence, a felonious taking. (See 2 Burdick, supra, § 496i, p. 261, citing 4 Blackstone, Commentaries 229, 232 [Blackstone’s definition of common law larceny, circa 1765].)
*783 Until the latter part of the 18th century, death was the punishment for all theft offenses except petty larceny. (3 LaFave, Substantive Criminal Law (2d ed. 2003) § 19.2, pp. 60-61 (LaFave), citing Model Pen. Code, com. to § 223.1, pp. 128-129.) By that time, English society and its judiciary had become troubled by that excessively harsh punishment for theft crimes. (Perkins, supra, at p. 290.) This concern led the English courts to limit the scope of larceny. (Id. at pp. 290-291; 3 Torcia, Wharton’s Criminal Law (15th ed. 1995) Larceny, § 342, p. 349.) For instance, it was held not to be larceny—and not a crime at all—if someone in lawful possession of another’s property misappropriated it for personal use (the later offense of embezzlement), or if someone acquired title to another’s property by fraud (the later offense of false pretenses). (See 3 LaFave, supra, at p. 57; see also 2 Burdick, supra, § 562; pp. 338-339, § 621, p. 456.) These limitations to the law of larceny made sense in light of that crime’s original purpose of preventing breaches of the peace; because embezzlement and false pretenses lacked larceny’s requirement of a “trespass in the taking,” they were viewed as less likely to result in violence. (3 LaFave, supra, at p. 57.)
Although common law larceny was in some ways narrowed to limit punishment by death, the scope of larceny was in other ways broadened to provide greater protection of private property. (See 3 LaFave, supra, at p. 57.) For instance, in 1799 an English court decision introduced the concept of “larceny by trick.” (Rex v. Pear (1779) 168 Eng.Rep. 208; Note, Larceny, Embezzlement and Obtaining Property by False Pretenses (1920) 20 Colum. L.Rev. 318, 319 (Note); see Perkins, supra, at pp. 304-305 [citing Tunnard’s Case (1729) 2 East P.C. 687, for first introducing the concept of “larceny by trick,” but noting it was the later case of Rex v. Pear that “gave real impetus to this new development”].) Larceny by trick, a form of larceny, involves taking possession of another’s property by fraud. (3 Torcia, Wharton’s Criminal Law, supra, § 343, p. 350.)
As mentioned at page 782, ante, larceny requires a trespassory taking, which is a taking without the property owner’s consent. (People v. Edwards (1925) 72 Cal.App. 102, 113 [236 P. 944] (Edwards).) Although a trespassory taking is not immediately evident when larceny occurs “by trick” because of the crime’s fraudulent nature, English courts held that a property owner who is fraudulently induced to transfer possession of the property to another does not do so with free and genuine consent, so “the one who thus fraudulently obtains possession commits a trespass . . . .” (2 Burdick, supra, § 535, p. 301; see 3 Torcia, Wharton’s Criminal Law, supra, § 343, p. 350; 2 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against Property, § 15, p. 39 [“[T]he fraud takes the place of the trespass and the defendant is guilty of larceny by trick or device.”].) A California Court of Appeal decision explained nearly 90 years ago; “Though the taking [in larceny] must be against the will of the owner or a trespass to his possession, still an actual *784 trespass or actual violence is not necessary. Fraud may take the place of force. ... In [cases of larceny by trick] the fraud vitiates the transaction, and the owner is deemed still to retain a constructive possession of the property.” (Edwards, supra, 72 Cal.App. at p. 113; see Davis, supra, 19 Cal.4th at p. 305, fn. 3 [“When the consent is procured by fraud it is invalid and the resulting offense is commonly called larceny by trick . . . .”].)
The reasoning supporting larceny by trick’s inclusion within the crime of larceny—that fraud vitiates the property owner’s consent to the taking—was not extended, however, to cases involving the fraudulent transfer of title. (3 LaFave, supra, §§ 19.1(b), 19.6(a), 19.7(a), pp. 61, 99, 114; see Perkins, supra, at p. 308.) Under the common law, if title was transferred, there was no trespass and hence no larceny. (2 Burdick, supra, § 535, p. 302; Perkins, supra, at p. 307.) The theory was that once title to property was voluntarily transferred by its owner to another, the recipient owned the property and therefore could not be said to be trespassing upon it. (2 Burdick, supra, § 564, p. 302; Perkins, supra, at p. 307.) Similarly, under the common law there was no trespass, and hence no larceny, when a lawful possessor of another’s property misappropriated it to personal use. (2 Burdick, supra, at p. 340.) These subtle limitations on the common law crime of larceny spurred the British Parliament in the 18th century to create the separate statutory offenses of theft by false pretenses and embezzlement (see id. at pp. 341, 471-472; 3 LaFave, supra, at pp. 61, 99, 114; Perkins, supra, at p. 308), as discussed below.
B. Crimes of Theft by False Pretenses and Embezzlement
In 1757, the British Parliament enacted a statute prohibiting theft by false pretenses. (30 Geo. II, ch. 24 (1757).) Forty-two years later, it enacted a statute prohibiting embezzlement. (39 Geo. III, ch. 85 (1799).) Each was considered a statutory offense separate and distinct from the common law crime of larceny. (3 LaFave, supra, § 19.1(b), p. 61.) Unlike larceny, the newly enacted offense of theft by false pretenses involved acquiring title over the property, not just possession. (Perkins, supra, at pp. 363-364.) Unlike larceny, the newly enacted offense of embezzlement involved an initial, lawful possession of the victim’s property, followed by its misappropriation. (2 Burdick, supra, § 564, p. 339.)
Britain’s 18th century division of theft into the three separate crimes of larceny, false pretenses, and embezzlement made its way into the early criminal laws of the American states. That import has been widely criticized in this nation’s legal community because of the seemingly arbitrary distinctions between the three offenses and the burden these distinctions have posed for prosecutors. (See, e.g., Perkins, supra, at p. 291 [“The intricacies of this *785 patchwork pattern [of theft crimes] are interesting as a matter of history but embarrassing as a matter of law-enforcement. . . . The wrongful appropriation of another’s money or chattels, with the willful intent to deprive the other thereof permanently, should constitute just one offense . . . .”]; 3 LaFave, supra, § 19.1(b), p. 61 [“As we now look back on history, matters would have been simpler ... if Parliament had stretched larceny rather than creating new crimes . . . .”]; Note, supra, 20 Colum. L.Rev. 318 [criticizing the distinctions among the three crimes as an unnecessary impediment to law enforcement]; Van Vechten v. American Eagle Fire Ins. Co. (1925) 239 N.Y. 303, 306 [146 N.E. 432] [Justice Benjamin Cardozo, then at the New York Court of Appeals, writing that the central distinction between larceny and embezzlement failed to “correspond to any essential difference in the character of the acts”]; Commonwealth v. Ryan (1892) 155 Mass. 523, 527 [30 N.E. 364] [Justice Oliver Wendell Holmes, Jr., then at the Mass. Supreme Judicial Court, describing the separation of embezzlement and larceny as a “historical accidento”].)
For instance, it was difficult at times to determine whether a defendant had acquired title to the property, or merely possession, a distinction separating theft by false pretenses from larceny by trick. (See, e.g., People v. Delbos (1905) 146 Cal. 734 [81 P. 131]; see also 2 Burdick, supra, at p. 303.) It was similarly difficult at times to determine whether a defendant, clearly guilty of some theft offense, had committed embezzlement or larceny, as an 1867 Massachusetts case illustrates. There, a defendant was first indicted for larceny and acquitted; later, on the same facts, he was indicted for embezzlement and convicted; and thereafter, on appeal, his conviction was set aside on the ground that his offense was larceny, not embezzlement. (Commonwealth v. O’Malley (1867) 97 Mass. 584; see Note, supra, 20 Colum. L.Rev. at pp. 322-323 [describing the above case as an example of the need to consolidate the three theft offenses].)
In the early 20th century, many state legislatures, recognizing the burdens imposed on prosecutors by the separation of the three crimes of larceny, false pretenses, and embezzlement, consolidated those offenses into a single crime, usually called “theft.”[3] (3 LaFave, supra, § 19.8(c), p. 145; see Note, supra, 20 Colum. L.Rev. at pp. 323-324 [describing early consolidation statutes].) The California Legislature did so in 1927, by statutory amendment. (§ 484, subd. (a), enacted in 1872, amended by Stats. 1927, ch. 619, § 1, p. 1046.) In a 1954 decision, this court explained: “The purpose of the consolidation was to remove the technicalities that existed in the pleading and *786 proof of these crimes at common law. Indictments and informations charging the crime of ‘theft’ can now simply allege an ‘unlawful taking.’ [Citations.] Juries need no longer be concerned with the technical differences between the several types of theft, and can return a general verdict of guilty if they find that an ‘unlawful taking’ has been proved. [Citations.] The elements of the several types of theft included within section 484 have not been changed, however, and a judgment of conviction of theft, based on a general verdict of guilty, can be sustained only if the evidence discloses the elements of one of the consolidated offenses.” (People v. Ashley (1954) 42 Cal.2d 246, 258 [267 P.2d 271] (Ashley); accord, Davis, supra, 19 Cal.4th at pp. 304-305.)
As we pointed out in Ashley, the California Legislature’s consolidation of larceny, false pretenses, and embezzlement into the single crime of theft did not change the elements of those offenses (Ashley, supra, 42 Cal.2d at p. 258), a fact that is significant to our analysis, as discussed below.
C. Elements of Robbery, Larceny, and Theft by False Pretenses and Their Application Here
We now consider the issue here: whether robbery’s element of “felonious taking” can be satisfied through theft by false pretenses, the type of theft defendant committed.
Robbery is “the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.” (§ 211.) Reflected in that statutory definition are larceny’s elements of “the taking of another’s property, with the intent to steal and carry it away.” (People v. Gomez (2008) 43 Cal.4th 249, 254-255 [74 Cal.Rptr.3d 123, 179 P.3d 917] (Gomez).) The taking required in larceny, as in robbery, must be “felonious.” (§ 484, subd. (a) [“Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another ... is guilty of theft” by larceny (italics added).].)
By adopting in the robbery statute (§ 211) the phrase “felonious taking” that was used in the common law with regard to both robbery and larceny, the California Legislature in all likelihood intended to attach to the statutory phrase the same meaning the phrase had under the common law., (Tufunga, supra, 21 Cal.4th at p. 946.)
As explained on page 782, ante, all larceny at common law was a felony, and thus the common law defined larceny as a “felonious taking.” (See also Perkins, supra, at p. 343; State v. Lopez (Ct.App. 1980) 94 N.M. 349, 351-352 [610 P.2d 753] [“ ‘Felonious taking’ means a taking with intent to commit the crime of larceny.”].) Because California’s robbery statute (§211) *787 uses the common law’s phrase “felonious taking,” and because at common law “felonious taking” was synonymous with larceny, we conclude that larceny is a necessary element of robbery. (See Gomez, supra, 43 Cal.4th at p. 254 [“In robbery, the elements of larceny are intertwined with [robbery’s] aggravating elements to make up the more serious offense.”]; People v. Crowley (1893) 100 Cal. 478, 479 [35 P. 84] [“[L]arceny and robbery are genetically the same—the one being merely an aggravated form of the other. Each is the felonious taking of the personal property of another, although in robbery the felonious taking is accomplished by force or threats.”]; People v. Nelson (1880) 56 Cal. 77, 80 [“ ‘Robbery is larceny, committed by violence, from the person of another.’ ”]; People v. Jones (1878) 53 Cal. 58, 59 [“an indictment for robbery must aver every fact necessary to constitute larceny, and more”].)
Two differences in the crimes of larceny and theft by false pretenses tend to support our conclusion that only theft by larceny, not by false pretenses, can fulfill the “felonious taking” requirement of robbery.
First, larceny requires “asportation,” which is a carrying away of stolen property. (Gomez, supra, 43 Cal.4th at p. 255, citing People v. Lopez (2003) 31 Cal.4th 1051, 1056 [6 Cal.Rptr.3d 432, 79 P.3d 548].) This element of larceny, although satisfied by only the slightest movement, continues until the perpetrator reaches a place of temporary safety. (Gomez, at p. 255.) Asportation is what makes larceny a continuing offense. (Id. at p. 254.) Because larceny is a continuing offense, a defendant who uses force or fear in an attempt to escape with property taken by larceny has committed robbery. (Id. at pp. 259-260; People v. Estes (1983) 147 Cal.App.3d 23, 27-28 [194 Cal.Rptr. 909].) Similarly, the Attorney General asserts that defendant committed robbery because he shoved the Walmart security guards during his attempt to flee the store after acquiring the store gift cards through theft by false pretenses.
But theft by false pretenses, unlike larceny, has no requirement of asportation. The offense requires only that “(1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation.” (People v. Wooten (1996) 44 Cal.App.4th 1834, 1842 [52 Cal.Rptr.2d 765].) The crime of theft by false pretenses ends at the moment title to the property is acquired, and thus cannot become robbery by the defendant’s later use of force or fear. Here, when defendant shoved the store security guards, he was no longer engaged in the commission of theft because he had already acquired title to the Walmart gift cards; therefore, defendant did not commit robbery.
*788 Section 484’s subdivision (a) does provide that “any false or fraudulent representation or pretense made shall be treated as continuing, so as to cover any money, property, or services received as a result thereof . . . .” (Italics added.) But that provision does not contemplate a physical continuation of the taking of property, unlike the asportation element of larceny, where the crime continues until the thief has reached a place of temporary safety. Rather, the provision refers to the later acquisition by the defendant of “money, property, or service” as the result of the initial fraud involved in theft by false pretenses. (§484, subd. (a); see People v. Frankfort (1952) 114 Cal.App.2d 680, 704 [251 P.2d 401].) In theft by false pretenses, it is the fraud that continues, not the physical taking of the stolen property.
We now consider another significant difference between larceny and theft by false pretenses. As previously noted on pages 782 and 783, ante, larceny requires a “trespassory taking,” which is a taking without the property owner’s consent. (Edwards, supra, 72 Cal.App. at p. 113.) This element of larceny, like all its other elements, is incorporated into California’s robbery statute. (Ortega, supra, 19 Cal.4th at p. 694; 2 Burdick, supra, § 595, p. 408.) By contrast, theft by false pretenses involves the consensual transfer of possession as well as title of property; therefore, it cannot be committed by trespass. This is illustrated by the facts in a recent Court of Appeal decision, People v. Beaver (2010) 186 Cal.App.4th 107 [111 Cal.Rptr.3d 726]. There, the defendant staged an accident at his place of employment, a ski resort, to obtain medical expenses for a preexisting injury to his knee. The defendant was convicted of grand theft. The Court of Appeal reversed the conviction, holding that the jury was instructed on the incorrect type of theft—theft by larceny—and instead should have been instructed on theft by false pretenses. Beaver said: “The present matter did not involve a taking of property from another without his consent. [The ski resort] willingly paid for defendant’s medical treatment on the false representation that [it] had caused defendant’s injuries. This was theft by false pretenses, not larceny.” (Id. at p. 121.) The essence of Beaver’s holding is this: Because the ski resort consented to paying for the defendant’s medical treatment, the defendant did not commit a trespassory taking, and hence did not commit larceny.
Here too defendant did not commit larceny. Walmart, through its store employees, consented to transferring title to the gift cards to defendant. Defendant acquired ownership of the gift cards through his false representation, on which Walmart relied, that he was using valid payment cards to purchase the gift cards. Only after discovering the fraud did the store seek to reclaim possession. Because a “felonious taking,” as required in California’s robbery statute (§ 211), must be without the consent of the property owner, or “against his will” (ibid.), and Walmart consented to the sale of the gift cards, defendant did not commit a trespassory (nonconsensual) taking, and hence did not commit robbery. Moreover, unlike the offense of larceny by trick, in *789 which a defendant’s fraud vitiates the consent of the victim as a matter of law, the acquisition of title involved in the crime of theft by false pretenses precludes a trespass from occurring. (See pp. 783-784, ante.) Therefore, theft by false pretenses cannot satisfy the “felonious taking” element of robbery.[4]
The dissent proposes a theory, not discussed in the parties’ briefs, to bring defendant within the robbery statute. It relies on section 490a, which states: “Wherever any law or statute of this state refers to or mentions larceny, embezzlement, or stealing, said law or statute shall ... be read and interpreted as if the word ‘theft’ were substituted therefor.” The gist of the dissent’s reasoning is this: Section 490a says any law or statute that refers to or mentions larceny or stealing must be construed as meaning “theft”; although the robbery statute (§ 211) does not expressly mention larceny or stealing, it refers to them indirectly through the words “felonious taking,” which should be interpreted under section 490a as meaning “theft,” a crime that includes theft by false pretenses. Therefore, the dissent concludes, the “felonious taking” element in the robbery statute encompasses defendant’s conduct in this case. (Dis. opn. of Baxter, J., post, at p. 797.)
The dissent’s theory would require us to conclude that, by enacting section 490a, the Legislature intended to alter two of the substantive elements of robbery: asportation and a trespassory taking. (See pp. 787-788, ante.) But the 1927 legislation enacting section 490a and the theft consolidation statute (§ 484, subd. (a); Stats. 1927, ch. 619, § 1, p. 1046) left unchanged the elements of theft. (Ashley, supra, 42 Cal.2d at p. 258.) We are not persuaded that the Legislature intended to alter the elements of robbery, to which section 490a makes no reference whatever, while also intending to leave intact the elements of theft, to which it explicitly refers. As this court said more than 80 years ago, “the essence of section 490a is simply to effect a change in nomenclature without disturbing the substance of any law.” (People v. Myers (1929) 206 Cal. 480, 485 [275 P. 219], italics added.)[5]
*790 in
In resolving many complex legal issues, as Justice Oliver Wendell Holmes, Jr., observed, “a page of history is worth a volume of logic.” (New York Trust Co. v. Eisner (1921) 256 U.S. 345, 349 [65 L.Ed. 963, 41 S.Ct. 506].) To determine the meaning of the words “felonious taking” in our statutory definition of robbery, we have delved into the sources of this statutory definition and, in turn, into the history of the common law crime of larceny and the statutory crime of theft by false pretenses. This review has led us to conclude that the words “felonious taking” in the robbery definition were intended to refer only to theft committed by larceny and not to theft by false pretenses.
The logic and fairness of this conclusion may be open to question because a thief who uses force to resist capture may be equally culpable whether the theft was committed by larceny (for example, ordinary shoplifting) or by false pretenses (as occurred here). Nevertheless, our task is simply to interpret and apply the laws as the Legislature has enacted them, not to revise or reform them to better reflect contemporary standards.
We reverse the Court of Appeal’s judgment upholding defendant’s four robbery convictions. Because other aspects of the Court of Appeal’s decision may be affected by our reversal of defendant’s robbery convictions, the matter is remanded to that court for further proceedings consistent with the views expressed in this opinion.
Cantil-Sakauye, C. J., Werdegar, J., Chin, J., Corrigan, J., and Liu, J., concurred.

 Because the record is unclear as to the specific kind of cards used by defendant for the fraudulent purchase of the store gift cards, we simply use the term “payment card.”

 Before 1707, the legislative body that enacted the laws of England was the English Parliament. In that year, the kingdoms of England and Scotland joined and became known as the United Kingdom of Great Britain, and their shared parliament became known as the Parliament of Great Britain. (<http://www.parliament.uk/about/living-heritage/ evolutionofparliament/legislativescrutiny/act-of-union-1707> [as of Aug. 26, 2013].) Thus, when referring to parliamentary acts occurring after the year 1707, we refer to the British Parliament as opposed to the English Parliament.

 New York’s statute consolidating the offenses, enacted in 1909, is labeled “Larceny,” not theft. (N.Y. Penal Law, § 155.05; id., former § 1290.) Similarly, the British Parliament consolidated the three offenses under the Larceny Act of 1916. (6 & 7 Geo. V, ch. 50 (1916).)

 In the dissent’s view, “the outcome in this case [is] particularly troubling” because “no charge of felony murder robbery would lie” if a defendant who has committed theft by false pretenses killed a store employee while fleeing with the loot. (Dis. opn. of Baxter, J., post, at p. 803, fn. 7.) But this would also be true if a defendant killed a store employee while fleeing after committing any crime other than larceny. It is for the Legislature, not this court, to determine the scope of felony-murder robbery. (See Tufunga, supra, 21 Cal.4th at p. 950 [“[W]hether [an] amendment [to the robbery statute] would better reflect sound public policy is one properly addressed to [the Legislature] rather than to this court.”].) Also, if a defendant enters a store with the intent to commit theft by false pretenses (as defendant did here), and if that defendant, while fleeing, kills a store employee, that defendant can be convicted of felony-murder burglary.

 The dissent “would place greater reliance on the later decisions of this court” that, in the dissent’s view, “have gone on to explain in greater detail the full legislative intent and purpose behind the consolidated theft statutes .. ..” (Dis. opn. of Baxter, J., post, at p. 796, fn. 4, citing *790 Gomez, supra, 43 Cal.4th at p. 255, fn. 4 and Ashley, supra, 42 Cal.2d at p. 258.) But those cases do not at all undermine this court’s 1929 holding in People v. Myers, supra, 206 Cal. 480. (See Ashley, supra, at p. 258 [citing Myers with approval].)